# DRIVE-BY BPO
by ClearCapital

**1254 GATE POST LN**
POWDER SPRINGS, GA 30127

**$455,000**
Loan Number     ● As-Is Value

Please Note: This report was completed with the following assumptions: Market Approach: **Other** , Marketing Time: **Typical** . Important additional information relating to this report, including use and restrictions, is contained in an attached addendum which is an integral part of this report.

| | | | |
|---|---|---|---|
| **Address** | 1254 Gate Post Ln, Powder Springs, GA 30127 | **Order ID** | 8372296 | 
| **Inspection Date** | 08/10/2022 | **Date of Report** | 08/12/2022 |
| **Loan Number** | | **APN** | 19-0230-0-017-0 |
| **Borrower Name** | MICHAEL DAVID SISKEY | **County** | Cobb |

**Order ID** 8372296    **Property ID** 33155633

### Tracking IDs

| | | | |
|---|---|---|---|
| **Order Tracking ID** | Mon Aug 08 22 12:00P - Mon Aug 08 22 5:0 0P Batch | **Tracking ID 1** | 13623558.1 |
| **Tracking ID 2** | 189 | **Tracking ID 3** | -- |

## General Conditions

| | | | |
|---|---|---|---|
| **Owner** | Siskey Michael David | **Condition Comments** | |
| **R. E. Taxes** | $3,817 | | |
| **Assessed Value** | $375,090 | | |
| **Zoning Classification** | Residential | | |
| **Property Type** | SFR | | |
| **Occupancy** | Occupied | | |
| **Ownership Type** | Fee Simple | | |
| **Property Condition** | Average | | |
| **Estimated Exterior Repair Cost** | $0 | | |
| **Estimated Interior Repair Cost** | $0 | | |
| **Total Estimated Repair** | $0 | | |
| **HOA** | Heritage Property Managemt 770-451-8171 | | |
| **Association Fees** | $775 / Year (Pool,Tennis) | | |
| **Visible From Street** | Visible | | |
| **Road Type** | Public | | |

**Condition Comments**

Subject is average condition. Subject is located on the main street inside the community with minimal traffic coming through. There are no signs of major damage besides normal wear and tear. subject conform to the rest of homes in the community.

## Neighborhood & Market Data

| | | |
|---|---|---|
| **Location Type** | Suburban | |
| **Local Economy** | Stable | |
| **Sales Prices in this Neighborhood** | Low: $420,000 High: $500,000 | |
| **Market for this type of property** | Remained Stable for the past 6 months. | |
| **Normal Marketing Days** | <90 | |

**Neighborhood Comments**

Subject community is a quiet established neighborhood in Powder Springs. It has easy access to city major roads-Dallas Highway and Old Lost Mountain Rd. There are lots of shopping centers, Restaurants, Schools, and other businesses close to subject's community. There are 6 active listings and 11 sold comps within one to 2 miles from subject. Some have been used in this report. It was not necessary to exceed client requirements of distance, acreage, room count, sq ft, and time I have used the best available comps in my professional opinion.

# DRIVE-BY BPO
by ClearCapital

**1254 GATE POST LN**
POWDER SPRINGS, GA 30127

| | | |
|---|---|---|
| | Loan Number | **$455,000** |
| | | ● As-Is Value |

## Current Listings

| | Subject | Listing 1 | | Listing 2 | | Listing 3 * | |
|---|---|---|---|---|---|---|---|
| Street Address | 1254 Gate Post Ln | 1455 Echo Mill Dr | | 213 Wyndham Woods Trl | | 1316 Cotton Gin | |
| City, State | Powder Springs, GA | Powder Springs, GA | | Dallas, GA | | Powder Springs, GA | |
| Zip Code | 30127 | 30127 | | 30157 | | 30127 | |
| Datasource | Tax Records | MLS | | MLS | | MLS | |
| Miles to Subj. | -- | 0.75 [1] | | 2.94 [1] | | 1.22 [1] | |
| Property Type | SFR | SFR | | SFR | | SFR | |
| Original List Price $ | $ | $499,500 | | $429,900 | | $521,000 | |
| List Price $ | -- | $499,500 | | $429,900 | | $521,000 | |
| VALUE ADJUSTMENTS | Description | Description | +(-) Adj. | Description | +(-) Adj. | Description | +(-) Adj. |
| Original List Date | | 06/16/2022 | $0 | 07/06/2022 | $0 | 03/24/2022 | $0 |
| DOM · Cumulative DOM | -- · -- | 29 · 57 | $0 | 35 · 37 | $0 | 136 · 141 | $0 |
| Age (# of years) | 21 | 23 | $0 | 27 | $0 | 19 | $0 |
| Condition | Average | Average | $0 | Average | $0 | Good | -$20,000 |
| Sales Type | -- | Fair Market Value | $0 | Fair Market Value | $0 | Fair Market Value | $0 |
| Location | Beneficial ; Residential | Beneficial ; Residential | $0 | Beneficial ; Residential | $0 | Beneficial ; Residential | $0 |
| View | Beneficial ; City Street | Beneficial ; City Street | $0 | Beneficial ; City Street | $0 | Beneficial ; City Street | $0 |
| Style/Design | 2 Stories Traditional | 2 Stories Traditional | $0 | 2 Stories Traditional | $0 | 2 Stories Traditional | $0 |
| # Units | 1 | 1 | $0 | 1 | $0 | 1 | $0 |
| Living Sq. Feet | 2,965 | 2,823 | $4,686 | 2,214 | $24,783 | 2,732 | $7,689 |
| Bdrm · Bths · ½ Bths | 4 · 3 · 1 | 5 · 3 · 1 | -$5,000 | 4 · 2 · 1 | $5,000 | 4 · 3 · 1 | $0 |
| Total Room # | 8 | 9 | $0 | 7 | $0 | 8 | $0 |
| Garage (Style/Stalls) | Attached 2 Car(s) | Attached 2 Car(s) | $0 | Attached 2 Car(s) | $0 | Attached 2 Car(s) | $0 |
| Basement (Yes/No) | Yes | Yes | $0 | Yes | $0 | Yes | $0 |
| Basement (% Fin) | 0% | 0% | $0 | 0% | $0 | 0% | $0 |
| Basement Sq. Ft. | 672 | 1,668 | $0 | 1,088 | $0 | 1,211 | $0 |
| Pool/Spa | -- | -- | $0 | -- | $0 | -- | $0 |
| Lot Size | .37 acres | 0.69 acres | -$30,000 | 0.46 acres | $0 | 0.94 acres | -$60,000 |
| Other | 0 | 0 | $0 | 0 | $0 | 0 | $0 |
| Net Adjustment | -- | | -$30,314 | | +$29,783 | | -$72,311 |
| Adjusted Price | | | $469,186 | | $459,683 | | $448,689 |

* Listing 3 is the most comparable listing to the subject.
[1] Comp's "Miles to Subject" was calculated by the system.
[2] Comp's "Miles to Subject" provided by Real Estate Professional.
[3] Subject $/ft based upon as-is sale price.

DRIVE-BY BPO
by ClearCapital

1254 GATE POST LN
POWDER SPRINGS, GA 30127

Loan Number

$455,000
As-Is Value

Case 22-56977-pmb   Doc 12-1   Filed 09/16/22   Entered 09/16/22 12:27:02   Desc
Exhibit   Page 3 of 54

## Current Listings - Cont.

**Listing Comments** Why the comparable listing is superior or inferior to the subject.

**Listing 1**  Back on the market. Fantastic family home in sought after Echo Mill Subdivision! Sits in a cul-de-sac on a .74-acre lot. Soaring entry w/ beautiful windows & hardwood floors greet you as you enter. Gorgeous vaulted fireside family room flooded w/ natural light with french doors that lead to cozy rocking chair front deck. Eat-in kitchen and separate dining room. Upper-level features spacious master w/en-suite featuring over-sized double vanity, spa tub, separate shower, & walk-in closet. Nice open landing, 3 great sized secondary bedrooms & a full bath w/ tub/shower combo. Lower-level features huge, finished bonus/media room, full bath with tub/shower combo, 5th bedroom, then a nice sized raft room. Basement also features 2 unfinished areas; (would be a great storm shelter) & a 2nd large area w/ work bench & an exterior door w/ windows bring natural light in from a side terrace area w/ gate to front yard. Huge backyard has a great private deck for family BBQ's & bird watching, tree house for kids to play, storage unit, and spacious 2 car garage w/ cabinetry. This home is a blank canvas to make all your home dreams come true. Awesome active community w/ 2 clubhouses, 2 pools, 2 tennis courts & 2 playgrounds! Close to shopping, restaurants, parks & in a fantastic school district! Welcome Home!

**Listing 2**  Very nice two story with full finished basement. Open floorplan with vaulted ceilings. Great neighborhood and school district. No lockbox. Seller will need 7 days after closing to vacate.

**Listing 3**  4 bedroom 3.5 bathroom stunner in Powder Springs! Enjoy preparing meals in this impressive kitchen equipped with ample cabinets and generous counter space. Flow into the living room featuring a cozy fireplace, perfect for entertaining. Primary bathroom features a separate tub and shower, sink. Lush green landscape surrounds this beautiful house. Don't wait! Make this beautiful home yours today.

# DRIVE-BY BPO
by ClearCapital

**1254 GATE POST LN**
POWDER SPRINGS, GA 30127

| | Loan Number | $455,000 • As-Is Value |
|---|---|---|

## Recent Sales

| | Subject | Sold 1 * | | Sold 2 | | Sold 3 | |
|---|---|---|---|---|---|---|---|
| Street Address | 1254 Gate Post Ln | 5350 Flowering Dogwood Ct | | 1173 Fawn Meadow Dr | | 5720 Hatchery Way | |
| City, State | Powder Springs, GA | Powder Springs, GA | | Powder Springs, GA | | Powder Springs, GA | |
| Zip Code | 30127 | 30127 | | 30127 | | 30127 | |
| Datasource | Tax Records | MLS | | MLS | | MLS | |
| Miles to Subj. | -- | 0.40 ¹ | | 0.15 ¹ | | 0.44 ¹ | |
| Property Type | SFR | SFR | | SFR | | SFR | |
| Original List Price $ | -- | $491,000 | | $459,900 | | $450,000 | |
| List Price $ | -- | $491,000 | | $459,900 | | $450,000 | |
| Sale Price $ | -- | $481,500 | | $450,000 | | $493,000 | |
| Type of Financing | -- | Conv | | Conv | | Conv | |
| VALUE ADJUSTMENTS | Description | Description | +(-) Adj. | Description | +(-) Adj. | Description | +(-) Adj. |
| Date of Sale | -- | 04/28/2022 | $0 | 03/16/2022 | $0 | 05/31/2022 | $0 |
| DOM · Cumulative DOM | -- · -- | 57 · 57 | $0 | 47 · 47 | $0 | 28 · 28 | $0 |
| Age (# of years) | 21 | 24 | $0 | 22 | $0 | 20 | $0 |
| Condition | Average | Average | $0 | Good | -$20,000 | Good | -$20,000 |
| Sales Type | -- | Fair Market Value | $0 | Fair Market Value | $0 | Fair Market Value | $0 |
| Location | Beneficial ; Residential | Beneficial ; Residential | $0 | Beneficial ; Residential | $0 | Beneficial ; Residential | $0 |
| View | Beneficial ; City Street | Beneficial ; City Street | $0 | Beneficial ; City Street | $0 | Beneficial ; City Street | $0 |
| Style/Design | 2 Stories Traditional | 2 Stories Traditional | $0 | 2 Stories Traditional | $0 | 2 Stories Traditional | $0 |
| # Units | 1 | 1 | $0 | 1 | $0 | 1 | $0 |
| Living Sq. Feet | 2,965 | 2,830 | $4,455 | 2,435 | $17,490 | 2,840 | $4,125 |
| Bdrm · Bths · ½ Bths | 4 · 3 · 1 | 4 · 3 · 1 | $0 | 3 · 3 | $10,000 | 4 · 3 | $5,000 |
| Total Room # | 8 | 7 | $0 | 6 | $0 | 7 | $0 |
| Garage (Style/Stalls) | Attached 2 Car(s) | Attached 2 Car(s) | $0 | Attached 3 Car(s) | -$4,000 | Attached 2 Car(s) | $0 |
| Basement (Yes/No) | Yes | No | $40,000 | Yes | $0 | Yes | $0 |
| Basement (% Fin) | 0% | 0% | $0 | 0% | $0 | 0% | $0 |
| Basement Sq. Ft. | 672 | -- | $0 | 2,267 | $0 | 872 | $0 |
| Pool/Spa | -- | -- | $0 | -- | $0 | -- | $0 |
| Lot Size | .37 acres | 0.55 acres | -$18,000 | 0.33 acres | $0 | 0.28 acres | $0 |
| Other | 0 | 0 | $0 | 0 | $0 | 0 | $0 |
| Net Adjustment | -- | | +$26,455 | | +$3,490 | | -$10,875 |
| Adjusted Price | -- | | $507,955 | | $453,490 | | $482,125 |

* Sold 1 is the most comparable sale to the subject.
¹ Comp's "Miles to Subject" was calculated by the system.
² Comp's "Miles to Subject" provided by Real Estate Professional.
³ Subject $/ft based upon as-is sale price.

# DRIVE-BY BPO
by ClearCapital

1254 GATE POST LN
POWDER SPRINGS, GA 30127

Loan Number

**$455,000**
● As-Is Value

## Recent Sales - Cont.

**Reasons for Adjustments**  Why the comparable sale is superior or inferior to the subject.

**Sold 1**  Welcome to this charming 4 bedroom, 3.5 bathroom home in Powder Springs! Enter into a grand foyer as sleek flooring guides you into the living room boasting high ceilings, ample natural light, and a cozy fireplace to warm up to. Prepare a meal in the eat-in kitchen then make your way to the formal dining room for gatherings. Your oasis awaits in the primary bedroom desirably located on the main floor with an en-suite bathroom and a walk-in closet. Venture outside to the back patio overlooking your expansive yard that is great for entertaining. Close to shops and dining!

**Sold 2**  RARE FIND RANCH HOME ON FULL BASEMENT WITH PRIVATE OFFICE !!! Beautiful two story foyer and high ceilings let in all the natural light to enjoy spacious living room with fireplace in great room. Nice sized bedroom and 3 full bath. Fantastic Master with double trey-ceiling, spacious walk-in closet large master bath. Enjoy private back yard. Great time to move into great neighborhood., this community includes two pools, two club houses, playgrounds, walking trails, multiple tennis courts, Soccer fields & Volleyball Court. Top rated schools. . Desirable school district in beautiful West Cobb. Put your personal touch in this spacious home and make it your own !!!!

**Sold 3**  Welcome home to this charming 4/3 ranch in sought after Echo Mill subdivision. The main floor hosts the primary suite and two additional bedrooms, as well as the vaulted family room, formal dining room, and white eat-in kitchen. Upstairs, you'll find the 4th bedroom, 3rd bath, an office space, and a bonus room to use any way you wish. There is additional storage off the backyard. The backyard oasis is landscaped and fenced, and backs up to green space. Its so private you'll never know you have neighbors! If you want to get to know your neighbors, meet up at the pool or tennis court! Don't let this one get away!

# DRIVE-BY BPO
by ClearCapital

**1254 GATE POST LN**
POWDER SPRINGS, GA 30127

Loan Number

**$455,000**
As-Is Value

## Subject Sales & Listing History

| | | |
|---|---|---|
| **Current Listing Status** | Not Currently Listed | **Listing History Comments** |
| **Listing Agency/Firm** | | The preparer of this report checked the mls and fmls systems for previous listing history but found none for subject for the last year |
| **Listing Agent Name** | | |
| **Listing Agent Phone** | | |
| **# of Removed Listings in Previous 12 Months** | 0 | |
| **# of Sales in Previous 12 Months** | 0 | |

| Original List Date | Original List Price | Final List Date | Final List Price | Result | Result Date | Result Price | Source |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

## Marketing Strategy

| | As Is Price | Repaired Price |
|---|---|---|
| **Suggested List Price** | $455,000 | $455,000 |
| **Sales Price** | $455,000 | $455,000 |
| **Comments Regarding Pricing Strategy** | | |

Subject list price is determined based on the sales and listings in the area of home similar to subject in the area of room count, style, age, and sq ft. It was difficult to find better comps for this report because of subject's sqft and room count. The preparer of this report extended search up to 5miles radius but could not find sold comps with 6 room counts and similar sqft as subject. Comps used here are the best available. A comp sold for more than the list price and this maybe due to multiple offers received.

# DRIVE-BY BPO
by ClearCapital

**1254 GATE POST LN**
POWDER SPRINGS, GA 30127

Loan Number

● As-Is Value
**$455,000**

| Clear Capital Quality Assurance Comments Addendum |
|---|
| **Reviewer's Notes** Broker went back out and took new photos of the subject. The broker's as-is conclusion reflects the market for the subject. Comps are within a reasonable distance, relatively current, and accurately reflect the subject's defining characteristics. Thus, the as-is conclusion appears to be adequately supported. |
|  |

# DRIVE-BY BPO
by ClearCapital

1254 GATE POST LN
POWDER SPRINGS, GA 30127

$455,000

Loan Number · As-Is Value

## Subject Photos




Front



Front



Address Verification



Side



Side



Street

# DRIVE-BY BPO
by ClearCapital

1254 GATE POST LN
POWDER SPRINGS, GA 30127

**$455,000**

Loan Number | As-Is Value

## Subject Photos



Street



Other



Other



Other



Other

# DRIVE-BY BPO
by ClearCapital

1251 GATE POST LN
POWDER SPRINGS, GA 30127

**$455,000**

Loan Number  ● As-Is Value

## Listing Photos

 1455 Echo Mill Dr
Powder Springs, GA 30127



Front

L2 213 Wyndham Woods Trl
Dallas, GA 30157



Front

L3 1316 Cotton Gin
Powder Springs, GA 30127



Front

# DRIVE-BY BPO
by ClearCapital

## Sales Photos

 **S1** 5350 Flowering Dogwood Ct
Powder Springs, GA 30127



Front

 **S2** 1173 Fawn Meadow Dr
Powder Springs, GA 30127



Front

 **S3** 5720 Hatchery Way
Powder Springs, GA 30127



Front


# DRIVE-BY BPO
by ClearCapital

**1254 GATE POST LN**
POWDER SPRINGS, GA 30127

**$455,000**

Loan Number          As-Is Value

---

### ClearMaps Addendum

| | | | | |
|---|---|---|---|---|
| **Address** | ☆ 1254 Gate Post Ln, Powder Springs, GA 30127 | | | |
| **Loan Number** | | **Suggested List** $455,000 | **Suggested Repaired** $455,000 | **Sale** $455,000 |



| Comparable | Address | Miles to Subject | Mapping Accuracy |
|---|---|---|---|
| ☆ Subject | 1254 Gate Post Ln, Powder Springs, GA 30127 | -- | Parcel Match |
| L1 Listing 1 | 1455 Echo Mill Dr, Powder Springs, GA 30127 | 0.75 Miles [1] | Parcel Match |
| L2 Listing 2 | 213 Wyndham Woods Trl, Dallas, GA 30157 | 2.94 Miles [1] | Parcel Match |
| L3 Listing 3 | 1316 Cotton Gin, Powder Springs, GA 30127 | 1.22 Miles [1] | Parcel Match |
| S1 Sold 1 | 5350 Flowering Dogwood Ct, Powder Springs, GA 30127 | 0.40 Miles [1] | Parcel Match |
| S2 Sold 2 | 1173 Fawn Meadow Dr, Powder Springs, GA 30127 | 0.15 Miles [1] | Parcel Match |
| S3 Sold 3 | 5720 Hatchery Way, Powder Springs, GA 30127 | 0.44 Miles [1] | Parcel Match |

[1] The Comparable "Distance from Subject" value has been calculated by the Clear Capital system.
[2] The Comparable "Distance from Subject" value has been provided by the Real Estate Professional.

# DRIVE-BY BPO
by ClearCapital

1254 GATE POST LN
POWDER SPRINGS, GA 30127

Loan Number

$455,000
● As-Is Value

---

## Addendum: Report Purpose

### Market Approach and Market Time

The Market Approach of this report, as established by the customer, is: **Other**. (See definition below.)
The Marketing Time as specified by the customer is **Typical**. (See definition below.)

| Definitions: | |
| --- | --- |
| Fair Market Price | A price at which the property would sell between a willing buyer and a willing seller neither being compelled by undue pressure and both having reasonable knowledge of relevant facts. |
| Distressed Price | A price at which the property would sell between a willing buyer and a seller acting under duress. |
| Marketing Time | The amount of time the property is exposed to a pool of prospective buyers before going into contract. The customer either specifies the number of days, requests a marketing time that is typical to the subject's market area and/or requests an abbreviated marketing time. |
| Typical for Local Market | The estimated time required to adequately expose the subject property to the market resulting in a contract of sale. |

125 GATE POST LN
POWDER SPRINGS, GA 30127

$455,000

Loan Number    ● As-Is Value

| Addendum: Report Purpose - cont. |
|---|

### Report Instructions

This section shows the instructions that were approved by the customer and provided to the broker prior to completing the report.
*** Customer Supplied Subject Information: Quick Sale Value needed, subject assumed to be in below average or fair condition, comps should be below average or fair condition ***

Instructions last updated: 7/9/2021
Customer specific instructions:
SUBJECT PROPERTY CONDITION ASSUMPTION:
1. Please assume the subject's interior condition is below average or fair (C4, C5 or C6)
COMP SELECTION:
1. Comparable properties that exhibit below average or fair condition should be used
2. Use of remodeled, updated or otherwise good condition properties should be avoided.
PRICING STRATEGY:
1. The purpose of this report is to provide a QUICK SALE price estimate that the property would sell for in an open market
2. As-Is (60-90 Day): should indicate the price the property would sell for in an accelerated timeline in its present condition, under 30 days exposure to the market
3. As-is (Quick Sale) should MATCH the 60-90 day value
4. As-Repaired price estimate: Assume all repair items are completed, provide an estimated price the subject would sell for.
Purpose:
The purpose of this report is to provide a QUICK SALE price estimate that the property would sell for in an open market
Non Visible
If the subject is not visible from the road due to being down a long driveway or in a gated community, please upload a photo of the gate or driveway showing the subject is not accessible. Please add commentary to the report stating why the subject is not visible. Please upload a MLS photo of the subject (if available) to the report and add commentary stating it is the MLS photo. Please proceed with the report.
Comparable Requirements:

If any of the following comparable criteria cannot be met, commentary is required as to why you expanded your search, and what the effect on price will be.

1. Use comps from the same neighborhood, block or subdivision.
2. Comparable properties that exhibit below average or fair condition should be

# DRIVE-BY BPO
by ClearCapital

1254 GATE POST LN
POWDER SPRINGS, GA 30127

$455,000

Loan Number  •  As-Is Value

## Report Instructions - cont.

used.

3. Use of remodeled, updated or otherwise good condition properties should be avoided.

4. Use comps that have closed in the past 3 months to show the current market conditions. In rapidly changing markets, active listing comps should be given equal or greater weight than sold comps in your analysis.

5. Please copy and paste MLS Commentary for each Listing and Sales comp into the 'Comments and 'Reasons for Adjustments sections of the comp grid

Property Condition Definitions:

1. Poor: Uninhabitable or severely damaged from fire, flood, vandalism or mold

2. Fair: Repairs needed, may not be eligible for all forms of financing, below the neighborhood average

3. Average: Minor cosmetic or no repairs needed; typical for the neighborhood, move-in ready but no significant updates or renovations

4. Good: Above average, move in ready, no repairs necessary and has recent and significant updates and/or renovations (or, for customers that do not provide for 'Average', any move-in ready property)

5. Excellent: Newer construction (1-5 years) or high end luxury

Standard Instructions:

1. Clear Capital Code Of Conduct - Please make sure that you are always abiding by the Clear Capital Code of Conduct when completing valuation reports.

2. If the subject is currently listed, please consider all available information pertaining to the subject's condition. This information should be utilized when developing the assumption of the subject's condition.

3. Use the subject characteristics provided in the report Grid (if preloaded) to evaluate the property. This information is from a full interior appraisal and is assumed to be most accurate. If your inspection reveals obvious inaccuracies, please explain in the narrative of the report.

4. Include sufficient detail to help our mutual customer gain a complete understanding of the subject's neighborhood such as neighborhood desirability, amenities, parks, schools, commercial or industrial influences, REO activity, traffic, board-up-homes, etc.

5. Do not approach occupants or owners.

6. If the subject is a Commercial property, contact Clear Capital immediately at 530-582-5011 for direction on how to proceed with the report.

7. Please do not accept if you or your office has completed a report on this property in the last month, are currently listing this property, or have any vested interest in the subject property.

8. Clear Capital does not allow any log ins from IP addresses from foreign countries. This includes, but is not limited to; data entry services, form completion services, etc. Also, it is against Clear Capital code of conduct to share your password with anyone who is not a W2 employee in your office.

9. Clear Capital and our mutual customers greatly appreciate your expertise. If you cannot personally inspect the property, select comparables, and determine a price for the subject, please do not accept this report. Per the standards and guidelines adopted by Clear Capital and other industry leaders, the use of assistants to complete any of the aforementioned tasks is not permitted.

10. No part of your analysis or reporting may be based on the race, color, religion, sex, actual or perceived sexual orientation, actual or perceived gender identity, age, actual or perceived marital status, disability, familial status, national origin of either the prospective owners or occupants of the subject property, present owners or occupants of the property, or present owners or occupants of the properties in the vicinity of the subject property, or on any other basis prohibited by federal, state or local law.

Terms of Use, Code of Conduct and Professional Discretion

If you accept and perform this assignment, you do so in accordance with the Clear Capital Vendor Agreement Terms of Use and Code of Conduct to which you agreed.

All interactions with consumers (borrowers, homeowners, POCs, etc.) must be performed in a professional manner. Should you observe any concerning or suspicious activity while you engage with a consumer whether onsite or otherwise, please contact Clear Capital immediately. Please refrain from discussing anything related to the observation with the consumer directly. This includes suspected elder abuse, elder financial abuse, vulnerable adults, fraud, forgery or any violations of local, state or federal laws.

Due to the importance of an independent opinion of price, please do not discuss your price with anyone or be influenced by list price, pending offers, accept comp packets, repair estimates or the listing agent's opinion.

Photo Instructions:

In the case of camera malfunction and/ or if an inspector fails to inspect the property, it is prohibited to request another individual for photos.

1. Photos should be clear of car window glare, door frames, and mirrors.
2. Current and original photos of all sides of the subject (back of the subject in available)
3. Damages (upload enough photos to support your repair cost estimates)
4. Please provide close up photos of the subjects roof
5. Two street scene photos, one looking each direction down the street
6. One view photo looking across the street from the subject
7. One address verification photo
8. MLS photos of all (3) sold comparables, if available
9. MLS photos of all (3) listing comparables, if available

# DRIVE-BY BPO
by ClearCapital

1254 GATE POST LN
POWDER SPRINGS, GA 30127

$455,000

Loan Number              ● As-Is Value

## Broker Information

| | | | |
|---|---|---|---|
| **Broker Name** | Rose Udoumana | **Company/Brokerage** | Maximum One Realty Greater Atlanta |
| **License No** | 179645 | **Address** | 4605 Rugosa Way Austell GA 30106 |
| **License Expiration** | 08/31/2024 | **License State** | GA |
| **Phone** | 7709198825 | **Email** | fmu4@att.net |
| **Broker Distance to Subject** | 6.84 miles | **Date Signed** | 08/12/2022 |

*By confirming the above contact and real estate license information and submitting the report, the above signed hereby certifies and agrees that: 1) I personally took the pictures, selected comparables, and determined the price conclusion. 2) To the best of my knowledge, the statements of fact contained in this report are true and correct. 3) The reported analyses, opinions, and conclusions are my personal, impartial, and unbiased professional analyses, opinions, and conclusions. 4) I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved. 5) I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment. 6) My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined price point. 7) I did not base, either partially or completely, my analysis and/or opinion and conclusions in this report on race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law. 8) I maintain errors and omissions insurance, to the extent required by state law, for all liability associated with the preparation of this Report.*

**Disclaimer**

**This document is not an appraisal as defined by USPAP (Uniform Standards of Professional Appraisal Practice). It is not to be construed as an appraisal and may not be used as such for any purpose.**

**Unless otherwise specifically agreed to in writing:**
**The intended purpose of this report is to assist the Clear Capital account holder in making decisions within the scope of applicable statutory and regulatory requirements and performing required due diligence. This document is provided solely for the use of the Clear Capital account holder and not any other party, is not intended as any guarantee of value and/or condition of the subject property and should not be relied on as such. In the event that this document is found to be defective, incorrect, negligently prepared or unfit for its authorized use, Clear Capital's sole liability shall be to promptly refund the total fee expended by the account holder for this report or to replace it at no charge to the account holder, but in no event shall Clear Capital be responsible to the account holder for any indirect or consequential damages whatsoever. This warranty is in lieu of all other warranties, express or implied, except where otherwise required by law. The account holder shall notify Clear Capital within thirty (30) days of this report's delivery to the account holder if it believes that this document is defective, incorrect, negligently prepared or unfit for its authorized use. Under no circumstances may Clear Capital forms or their contents be published, copied, replicated, or mimicked.**

# NOTE

**SISKEY**

August 1, 2001          cartersville                    ga

[Date]                              [City]                              [State]

**1254 GATE POST LANE, POWDER SPRINGS, GA   30127**

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   **285,000.00**   (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
**FIRST UNION MORTGAGE CORPORATION**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   **7.1250**   %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the   **first**   day of each month beginning on   **September 1, 2001**   . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   **August 1, 2031**   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **1100 Corporate Center Dr., Raleigh, NC 27607-5066**
or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ **1,920.10**   .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**MULTISTATE FIXED RATE NOTE**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

*VMP* -5N (0005)          **Form 3200 1/01**
® VMP MORTGAGE FORMS · (800)521-7291
Page 1 of 3          Initials: _____

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **05** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.



Form 3200
Initials:

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
MICHAEL DAVID SISKEY        -Borrower

_____ (Seal)
SHARLEEN LYNN SISKEY        -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

*[Sign Original Only]*

PAY TO THE ORDER OF

---

**Wells Fargo Home Mortgage, Inc.**

WITHOUT RECOURSE

FIRST UNION MORTGAGE CORPORATION

BY: _Karen Davis_

Assistant Vice President
KAREN DAVIS

WITHOUT RECOURSE
PAY TO THE ORDER OF

**WELLS FARGO HOME MORTGAGE, INC.**

BY: _____

Jo Lennox, Assistant Secretary

Wachovia Bank, National Association, as Trustee under the
pooling and servicing agreement dated as of August 28, 2002



Investor.: ▆▆▆
Loan No: (scan barcode)

# LOAN MODIFICATION AGREEMENT (SECURITY DEED)

This Loan Modification Agreement ("Agreement"), made this **19TH** day of **SEPTEMBER, 2014**, between **MICHAEL DAVID SISKEY AND SHARLEEN LYNN SISKEY** ("Borrower") whose address is **1254 GATE POST LANE, POWDER SPRINGS, GEORGIA 30127** and **WELLS FARGO BANK, N.A.** ("Lender") whose address is **3476 STATEVIEW BLVD, MAC# X7801-03K, FORT MILL, SC 29715**, amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") dated **AUGUST 1, 2001** and recorded on **AUGUST 10, 2001** in **INSTRUMENT NO. 2001-0134140 BOOK 13403 PAGE 1894**, of the **OFFICIAL** Records of **COBB COUNTY, GEORGIA**, and (2) the Note **bearing the same date as**, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at

### 1254 GATE POST LANE, POWDER SPRINGS, GEORGIA 30127
(Property Address)

the real property described being set forth as follows:

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1.  As of **SEPTEMBER 19, 2014**, the new amount payable under the Note and the Security Instrument is U.S. **$241,531.83** ("New Principal Balance"), consisting of the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized with this modification. **$23,393.92** of the New Principal Balance shall be deferred (the "Secondary Principal Balance") and I will not pay interest or make monthly payments on this amount.

2.  Borrower promises to pay U.S. **$218,137.91** (the "Interest Bearing Principal Balance"), plus interest, to the order of Lender. Interest will be charged on the Interest Bearing Principal Balance less any

Wells Fargo Bank Secondary Loan Modification Agreemen ▆▆▆▆

First American Mortgage Services

principal reduction due to payments from Borrower at the yearly rate of **7.1250%**, from **OCTOBER 1, 2014**. Borrower promises to make monthly payments of PRINCIPAL AND INTEREST in the amount of U.S. **$1,920.10** beginning on **NOVEMBER 1, 2014**    Borrower will continue to make monthly payments on the same day of each succeeding month until principal and interest are paid in full, except that, if not sooner paid, the final payment of principal and interest shall be due and payable on **AUGUST 1, 2031** ("Maturity Date"). In addition to monthly principal and interest payments, Borrower shall make monthly escrow deposits as defined in the Note. Escrow deposit payments may be subject to change in the future.

3.    Borrower promises to pay the Secondary Principal Balance without interest thereon, to the order of the Lender and any other amounts still owed under the Note or Security Instrument by the earliest of the date I sell or transfer an interest in the property or am in default. I will be in default if I do not (i) pay the full amount of a monthly payment on the date it is due, or (ii) comply with the terms of the Note and Security Instrument, as modified by this Agreement.

4.    If on the Maturity Date, Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date.

5.    Borrower understands and agrees that:

    (a)    Borrower agrees that certain amounts owed will not be capitalized, waived, or addressed as part of this Agreement, and will remain owed until paid. These amounts owed are referenced in the Cover Letter to this Agreement, which is incorporated herein, and are to be paid with the return of this executed Agreement. If these amounts owed are not paid with the return of this executed Agreement, then Lender may deem this Agreement void.

    (b)    All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

    (c)    All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

    (d)    Borrower has no right of set-off or counterclaim, or any defense to the obligations of the Note or Security Instrument.

    (e)    Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

    (f)    All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender.

(g) Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.

(h) If included, the undersigned Borrower(s) acknowledges receipt and acceptance of the Notice of Special Flood Hazard disclosure.

(i) I consent to the disclosure of my personal information, including the terms of this modification, to any investor, owner, servicer, insurer or guarantor who owns, services, insures or guarantees my first lien account for purposes related to the second mortgage Consumer Relief Program. I also consent to the disclosure of my personal information to any entity that performs support services for the second mortgage Consumer Relief Program, including marketing, survey, research or other borrower outreach, data processing and technical systems consulting.

6. If I make a partial prepayment of principal, the Lender may apply the partial prepayment first to any remaining Secondary Principal Balance before applying such partial prepayment to other amounts due under this Agreement or the Note and Security Instrument.

In Witness Whereof, I have executed this Agreement.

Borrower: MICHAEL DAVID SISKEY

9-25-14
**Date**

Borrower: SHARLEEN LYNN SISKEY

9.25.14
**Date**

Borrower:

**Date**

Borrower:

**Date**

In Witness Whereof, the Lender have executed this Agreement.

**WELLS FARGO BANK, N.A.**

By _____

_____
Date

Wells Fargo Bank Secondary Loan Modification Agreement

First American Mortgage Services                          Page 4

# Addendum

This Addendum is made a part of that Loan Modification Agreement entered into between **WELLS FARGO BANK, N.A.** (the "Lender") and **MICHAEL DAVID SISKEY AND SHARLEEN LYNN SISKEY** (the "Borrower") dated **SEPTEMBER 19, 2014** the "Loan Modification Agreement").

Notwithstanding anything to the contrary contained in the Loan Modification Agreement, the parties hereto acknowledge the effect of a discharge in bankruptcy that may have been granted to the Borrower prior to the execution hereof and that the Lender may not pursue the Borrower for personal liability. However, the parties acknowledge that the Lender retains certain rights, including but not limited to the right to foreclose its lien under appropriate circumstances. The parties agree that the consideration for this Agreement is the Lender's forbearance from presently exercising its rights and pursuing its remedies under the Security Instrument as a result of the Borrower's default of its obligations thereunder. Nothing herein shall be construed to be an attempt to collect against the Borrower personally or an attempt to revive personal liability.
Notwithstanding any monthly payments hereunder, Borrower understands that (1) Lender's sole recourse is the enforcement of its security interest in the Property and any action which may exist in relation to the Property itself and that (2) nothing in this Agreement revives or purports to revive any debt, or create any personal liability or obligation for a debt, that was discharged in bankruptcy.

This agreement is only valid once consent of the United States Bankruptcy Court or other applicable approval to modify this mortgage is received.

(BORROWER MUST INITIAL HERE)

Signed this ___25th___ day of __September__, 20 __14__.

Lender                                                      Borrower

By: _____                _____
Name:                                                      **MICHAEL DAVID SISKEY**

                                                           _____
                                                           **SHARLEEN LYNN SISKEY**

                                                           _____

                                                           _____

                                                           _____

                                                           _____

Date: **SEPTEMBER 19, 2014**
Loan Number: **(scan barcode)**
Lender: **WELLS FARGO BANK, N.A.**

Borrower: **MICHAEL DAVID SISKEY, SHARLEEN LYNN SISKEY**

Property Address: **1254 GATE POST LANE, POWDER SPRINGS, GEORGIA 30127**

# NOTICE OF NO ORAL AGREEMENTS

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES.**

**Receipt of Notice.** The undersigned hereby admit to having each received and read a copy of this Notice on or before execution of the Loan Agreement. "Loan Agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, pursuant to which a financial institution loans or delays repayment of or agrees to loan or delay repayment of money, goods or any other thing of value or to otherwise extend credit or make a financial accommodation.

| | |
|---|---|
| Borrower | Date |
| **MICHAEL DAVID SISKEY** | |
| Borrower | Date |
| **SHARLEEN LYNN SISKEY** | |
| Borrower | Date |
| Borrower | Date |
| Borrower | Date |
| Borrower | Date |

First American Mortgage Services

Deed Book **13403** Pg **1894**
Filed and Recorded Aug-10-2001 09:24am
**2001-0134140**
Georgia Intangible Tax Paid $855.00

*Jay C. Stephenson*
Jay C. Stephenson
Clerk of Superior Court Cobb Cty. Ga.

Return To:
FIRST UNION MORTGAGE CORPORATION
1100 Corporate Center Dr (NC4723)
Raleigh, NC 27607

CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL

WELLS FARGO HOME MORTGAGE, INC.

Prepared By:

AFTER RECORDING, RETURN TO:
Vickey R. Atkins, P.C.
ATTN: Barbara Brent
481 East Main St.
Cartersville, GA 30120
File ▮▮▮▮▮▮

CERTIFIED TRUE AND CORRECT COPY OF ORIGINAL.
First Union Mortgage Corporation
BY: ▮▮▮▮▮

———————— [Space Above This Line For Recording Data] ————————

# SECURITY DEED

MIN ▮▮▮▮▮▮▮▮▮

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated **August 1, 2001**
together with all Riders to this document.
(B) **"Borrower"** is **MICHAEL DAVID SISKEY AND , SHARLEEN LYNN SISKEY**

Borrower is the grantor under this Security Instrument.
(C) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the grantee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

GEORGIA-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT WITH MERS**    Form 3011 1/01

**VMP** -6A(GA) (0005)
Page 1 of 14    Initials: ▮▮

VMP MORTGAGE FORMS - (800)521-7291

Deed Book **13403** Pg **1895**

**(D) "Lender"** is **FIRST UNION MORTGAGE CORPORATION**

Lender is a **A Corporation**
organized and existing under the laws of **NORTH CAROLINA**
Lender's address is
**1100 Corporate Center Dr., Raleigh, NC 27607-5066**
**(E) "Note"** means the promissory note signed by Borrower and dated **August 1, 2001**
The Note states that Borrower owes Lender
**Two Hundred Eighty-Five Thousand and No/100**                     Dollars
(U.S. $    **285,000.00**    ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **August 1, 2031**
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] |

WAIVER OF BORROWER'S RIGHTS/
CLOSING ATTORNEY'S AFFIDAVIT

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the
Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used

Initials:

-6A(GA) (0005)                     Page 2 of 14                     Form 3011  1/01

Deed Book **13403** Pg **1896**

in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS, with power of sale, the following described property located in the

**COUNTY**                                of **COBB**

[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

**SEE SCHEDULE A ATTACHED HERETO AND MADE A PART HEREOF**

Parcel ID Number:                                              which currently has the address of
**1254 GATE POST LANE**                                                    [Street]
**POWDER SPRINGS**                          [City] , Georgia    **30127**      [Zip Code]
("Property Address"):

TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Initials:

-6A(GA) (0005)                          Page 3 of 14                          Form 3011  1/01

Deed Book 13403 Pg 1897

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower

Initials:

shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10



Initials:

Deed Book 13403 Pg 1899

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to

Initials: ____

Deed Book 13403 Pg 1900

the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying

Initials:

Deed Book 13403 Pg 1901

reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, draining water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

Initials

Deed Book 13403 Pg 1902

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials:

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower'or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

, Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials:

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a

Initials: _____

Deed Book **13403** Pg **1905**

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials:

Deed Book 13403 Pg 1906

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.**

**Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law.**

**If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** Borrower waives all rights of homestead exemption in the Property.

**25. Assumption Not a Novation.** Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

**26. Security Deed.** This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

Initials:

Deed Book 13403 Pg 1907

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

_____ (Seal)        _____ (Seal)
MICHAEL DAVID SISKEY      -Borrower      SHARLEEN LYNN SISKEY      -Borrower

_____ (Seal)        _____ (Seal)
                         -Borrower                                -Borrower

_____ (Seal)        _____ (Seal)
                         -Borrower                                -Borrower

_____ (Seal)        _____ (Seal)
                         -Borrower                                -Borrower

**STATE OF GEORGIA,**                                    County ss:
  Signed, sealed and delivered in the presence of:

_____
Unofficial Witness

_____                                    County
Notary Public,
State of Georgia

[Notary seal: VICKEY R. ATKINS / NOTARY PUBLIC / GEORGIA / EXPIRES MAY 24 2004 / POLK COUNTY, GA]

Deed Book **13403** Pg **1908**

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **1st** day of **August, 2001** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **FIRST UNION MORTGAGE CORPORATION**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at: **1254 GATE POST LANE, POWDER SPRINGS, GA   30127**

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in **LOT 386 ECHO MILL LL 230 19TH DISTRICT**

(the "Declaration"). The Property is a part of a planned unit development known as **ECHO MILL**

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

MULTISTATE PUD RIDER - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Page 1 of 3                                    Initials:
**-7R** (0008)                VMP MORTGAGE FORMS - (800)521-7291                Form 3150 1/01

Deed Book 13403 Pg 1909

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials:

-7R (0008)                                    Page 2 of 3                                    Form 3150 1/01

Deed Book 13403 Pg 1910

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____ (Seal)
MICHAEL DAVID SISKEY            -Borrower

_____ (Seal)
SHARLEEN LYNN SISKEY            -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

Deed Book 13403 Pg 1911

File No.████

# EXHIBIT "A"

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 230 OF THE 19TH DISTRICT, 2ND SECTION, COBB COUNTY, GEORGIA, MORE PARTICULARLY DESCRIBED AS LOT 316, UNIT VII, PHASE 1, ECHO MILL SUBDIVISION, AS RECORDED THE 8TH DAY OF FEBRUARY, 1999, IN PLAT BOOK 178, PAGE 68, COBB COUNTY, GEORGIA RECORDS; SAID PLAT OF SURVEY BEING INCORPORATED HEREIN AND MADE A PART HEREOF BY REFERENCE.

GEORGIA
LOAN ▮
Deed Book 13403 Pg 1912
Jay C. Stephenson
Clerk of Superior Court Cobb Cty. Ga.

GRANTOR:   MICHAEL DAVID SISKEY and SHARLEEN LYNN SISKEY

LENDER:   FIRST UNION MORTGAGE CORPORATION

DATE OF SECURITY DEED:   August 1, 2001

## WAIVER OF BORROWER'S RIGHTS

BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY: (1) ACKNOWLEDGES THE RIGHT TO ACCELERATE THE DEBT AND THE POWER OF ATTORNEY GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE AS IS REQUIRED TO BE GIVEN UNDER THE PROVISIONS HEREOF; (2) WAIVES ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTION FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE AS IS SPECIFICALLY REQUIRED TO BE PROVIDED HEREOF; (3) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED AND SPECIFICALLY THIS PARAGRAPH AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED; (4) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED-FOR LOAN TRANSACTION; AND (5) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.

READ AND AGREED BY GRANTOR:

Signed, sealed and delivered
in the presence of

_____(SEAL)
MICHAEL DAVID SISKEY - Grantor

_____(SEAL)
SHARLEEN LYNN SISKEY - Grantor

Notary Public

_____(SEAL)
- Grantor

_____(SEAL)
- Grantor

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE
ORIGINAL.
_____
WELLS FARGO HOME MORTGAGE, INC.

## CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned closing attorney, who having been first duly sworn according to law, states under oath as follows:

In closing the above loan, but prior to the execution of the Deed to Secure Debt and "Waiver of Borrower's Rights" by the Borrowers, I reviewed with and explained to the Borrowers the terms and provisions of the Deed to Secure Debt and particularly the provisions thereof authorizing the Lender to sell the secured property by a nonjudicial foreclosure under a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrowers of Borrower's rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and a judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrowers of Borrower's rights. After said review with and explanation to Borrowers, Borrowers executed the Deed to Secure Debt and "Waiver of Borrower's Rights."

Based on said review and explanation to Borrowers, it is my opinion that Borrowers knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any such nonjudicial foreclosure.

Sworn to and subscribed before me on the date set forth above.

JUNE
25
2005

_____
Notary Public

_____
Closing Attorney

## FORECLOSURE CLOSING DISCLOSURE

O.C.G.A Section 7-1-1014(3) requires that we inform you that if you fail to meet any condition or term of the documents that you sign in connection with obtaining a mortgage loan you may lose the property that serves as collateral for the mortgage loan through foreclosure.

_____
MICHAEL DAVID SISKEY

_____
SHARLEEN LYNN SISKEY

_____

Deed Book 14918 Pg 5144
Filed and Recorded Feb-09-2012 11:30am
2012-0018872

*Jay C. Stephenson*
Jay C. Stephenson
Clerk of Superior Court Cobb Cty. Ga.

Recording Requested By: WELLS FARGO BANK, N.A.
When Recorded Return To: DEFAULT ASSIGNMENT, WELLS FARGO BANK, N.A. MAC: X9999-018 PO BOX
1629, MINNEAPOLIS, MN  55440-9790

## CORPORATE ASSIGNMENT OF SECURITY DEED

Cobb, Georgia
"SISKEY"

MERS #: ███████████    SIS #: 1-888-679-6377

Date of Assignment: February 1st, 2012
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR FIRST UNION
MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS at BOX 2026 FLINT MI 48501, 1901 E
VOORHEES ST STE C., DANVILLE, IL  61834
Assignee: US BANK NATIONAL ASSOCIATION, AS TRUSTEE, SUCCESSOR IN INTEREST TO WACHOVIA
BANK, N.A. (FORMERLY KNOWN AS FIRST UNION NATIONAL BANK) AS TRUSTEE FOR WELLS FARGO
ASSET SECURITES CORPORATION, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2002-1 at 4801
FREDERICA STREET, OWENSBORO, KY  42301

Executed By: MICHAEL DAVID SISKEY AND ,SHARLEEN LYNN SISKEY` To: MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC., AS NOMINEE FOR FIRST UNION MORTGAGE CORPORATION, ITS
SUCCESSORS AND ASSIGNS
Date of Security Deed:  08/01/2001 Recorded:  08/10/2001  in Book/Reel/Liber: 13403 Page/Folio: 1894 as
Instrument No.: 2001-0134140  In the County of Cobb, State of Georgia.

Property Address: 1254 GATE POST LANE, POWDER SPRINGS, GA  30127

   KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of
which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said
Mortgage having an original principal sum of $285,000.00 with interest, secured thereby, with all moneys now owing
or that may hereafter become due or owing in respect thereof, and the full benefit of all the powers and of all the
covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee,
the Assignor's beneficial interest under the Mortgage.

   TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the
terms contained in said Mortgage.

   MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR FIRST UNION MORTGAGE
CORPORATION, ITS SUCCESSORS AND ASSIGNS
On ___2/2/12___

By: _____
Tom Sananikone
Assistant Secretary

CORPORATE
SEAL

WITNESS                                              WITNESS

_____                    _____
Julie Ann Prieto                                        Angela Marie Williams

Deed Book 14918 Pg 5145
Jay C. Stephenson
Clerk of Superior Court Cobb Cty. Ga.

CORPORATE ASSIGNMENT OF SECURITY DEED Page 2 of 2

STATE OF Minnesota
COUNTY OF Dakota

On _2/2/201_ C_ before me, _____Robert W. Caruso_____, a Notary Public in Dakota County in the
State of Minnesota, personally appeared _____Tom Sananikone_____, Assistant Secretary, personally
known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_____Robert W. Caruso_____
Notary Expires: 1/31/2014

ROBERT W. CARUSO
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2014

(This area for notarial seal)

EXECUTION COPY

This **ASSIGNMENT AND ASSUMPTION AGREEMENT**, dated as of December 30, 2005 (this "Agreement"), is made and entered into among Wachovia Corporation ("Parent"), the affiliates of Parent set forth on the signature page hereto ("Sellers"), and U.S. Bank National Association ("Buyer").

**RECITALS:**

A.    *The Purchase Agreement*.  Buyer and Parent have entered into a Purchase Agreement, dated as of November 29, 2005 (the "Purchase Agreement"), providing for the continuation by Buyer of Parent's corporate trust and institutional custody businesses.

B.    *The Assigned Rights*.  In the Purchase Agreement, Buyer has agreed to purchase and assume the Rights at the Effective Time.

C.    *Intention of the Parties*.  It is the intention of the parties that the Buyer will succeed to all of the rights, titles, interests, appointments, capacities, privileges, duties and obligations of Parent and Sellers as trustee, fiduciary or agent with respect to each Relationship.

**NOW, THEREFORE,** the parties agree as follows:

SECTION 1.  *Definitions*.  Capitalized terms used but not defined in this Agreement have the meanings assigned to them in the Purchase Agreement.

SECTION 2.  *Transfer of Interest*.  Subject to the terms and conditions of the Purchase Agreement and Section 5 of this Agreement, effective as of Effective Time:

(a)  Parent and Sellers hereby sell, transfer, assign and convey to Buyer all of their right, title and interest in and to the Rights, Trust Assets, Custodial Assets and the Records, together with all rights to related fees, income and other amounts payable with respect thereto; and

(b)  Buyer accepts all of Parent and Sellers' right, title and interest in and to the Rights, Trust Assets, Custodial Assets and the Records.

SECTION 3.  *Resignation and Performance of Duties*.  With respect to any Relationship, effective as of the Succession Time for such Relationship, Parent and Sellers resign from and assign to Buyer the performance and discharge of all of their former duties and obligations under such Relationship and Buyer agrees to perform and discharge, as they become due, all the former duties and obligations of Parent and Sellers under such Relationship.

SECTION 4. *Assumed Liabilities.*

(a)  Effective as of the time set forth in the definition of "Assumed Liabilities", and subject to the terms and conditions of the Purchase Agreement, Parent and Sellers assign to Buyer, and Buyer hereby assumes, becomes responsible for and agrees to pay, perform, discharge when due and hold Parent and Sellers harmless from and against, all Assumed Liabilities.

(b)  The assumption by Buyer of the Assumed Liabilities shall not be construed to defeat, impair or limit in any way any rights and remedies of Parent or any Seller to contest or dispute the validity or amount thereof with respect to any claim involving a third party.

SECTION 5. *Authorizations.* Notwithstanding anything in this Agreement to the contrary, this Agreement will not constitute an assignment of any Relationship or any claim, right, benefit, liability or obligation arising under, or resulting from, any such Relationship, unless all Authorizations have been received with respect to that Relationship. Upon receipt of all Authorizations for any Relationship that is not a Succeeded Relationship as of the Effective Time, the Relationship will automatically transfer to Buyer, and Buyer will automatically assume any Assumed Liabilities with respect to such Relationship, without the necessity of execution of any further instrument or any further act or deed on the part of either of the parties hereto.

SECTION 6. *Purchase Agreement.* Notwithstanding any other provisions of this Agreement to the contrary, nothing contained herein shall in any way supersede, modify, alter, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions or any of the rights, obligations and remedies of the parties or their Affiliates set forth in the Purchase Agreement or any other agreement delivered in connection therewith. This Agreement is intended only to effect the assignment and assumption of the Rights and the Assumed Liabilities described herein as contemplated by the Purchase Agreement.

SECTION 7. ***Governing Law.*** **This Agreement will be governed by and construed in accordance with the law of the State of New York applicable to contracts made and to be performed entirely within that State.** Each party hereto agrees that service of process upon such party in any action or proceeding with respect to or arising out of this Agreement shall be effective if notice is given in accordance with Section 13.1 of the Purchase Agreement.

SECTION 8. *Counterparts.* This Agreement may be executed and delivered in any number of counterparts, each of which will be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement will become effective when each party has received a counterpart hereof signed by the other party.

***[Next page is a signature page.]***

-2-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

WACHOVIA CORPORATION

By: _____
     Name: David M. Carroll
     Title: Senior Executive Vice President

WACHOVIA BANK, NATIONAL ASSOCIATION

By: _____
     Name:
     Title:

WACHOVIA BANK OF DELAWARE, NATIONAL ASSOCIATION

By: _____
     Name:
     Title:

WACHOVIA TRUST COMPANY OF CALIFORNIA

By: _____
     Name:
     Title:

WACHOVIA BANK AND TRUST COMPANY (CAYMAN) LTD.

By: _____
     Name:
     Title:

*[Signature Page to Assignment & Assumption Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

WACHOVIA CORPORATION

By: _____
    Name:
    Title:

WACHOVIA BANK, NATIONAL ASSOCIATION

By: _____
    Name:  Darryl J. Fluhme
    Title:   Executive Vice President

WACHOVIA BANK OF DELAWARE, NATIONAL ASSOCIATION

By: _____
    Name:  Darryl J. Fluhme
    Title:   Executive Vice President

WACHOVIA TRUST COMPANY OF CALIFORNIA

By: _____
    Name:  Darryl J. Fluhme
    Title:   Executive Vice President

WACHOVIA BANK AND TRUST COMPANY (CAYMAN) LTD.

By: _____
    Name:
    Title:

*[Signature Page to Assignment & Assumption Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

WACHOVIA CORPORATION

By: _____
     Name:
     Title:

WACHOVIA BANK, NATIONAL ASSOCIATION

By: _____
     Name:
     Title:

WACHOVIA BANK OF DELAWARE, NATIONAL ASSOCIATION

By: _____
     Name:
     Title:

WACHOVIA TRUST COMPANY OF CALIFORNIA

By: _____
     Name:
     Title:

WACHOVIA BANK AND TRUST COMPANY (CAYMAN) LTD.

By: _____
     Name: DOYLE A. DALLY
     Title: MANAGING DIRECTOR

*[Signature Page to Assignment & Assumption Agreement]*

DELAWARE TRUST COMPANY,
NATIONAL ASSOCIATION

By: _____

Name: Jody McLean
Title: SVP

U.S. BANK NATIONAL ASSOCIATION

By: _____

Name:
Title:

*[Signature Page to Assignment & Assumption Agreement]*

DELAWARE TRUST COMPANY,
NATIONAL ASSOCIATION

By: _____
     Name:
     Title:

U.S. BANK NATIONAL ASSOCIATION

By: _____
     Name:
     Title:

*[Signature Page to Assignment & Assumption Agreement]*